Case No. 14, Firefighter and Managing Parks v. UPS Supply Chain Solutions Argument not to exceed 15 minutes to decide, and Mr. Blankenship, you may proceed for the appellant. Good morning, and thank you. We moved your case around, and I think you know why we did it for the other counsel, but I appreciate your patience. Alright, at least we were able to make it here. If it pleases the Court, my name is Randy Blankenship. I'm the attorney for Gene Parks. I would like to reserve three minutes of my time for rebuttal. Very well. Your Honors, this case is before the Court on a Grant of Summary Judgment or Appeal from a Grant of Summary Judgment, an FMLA case, and a case arising in the Kentucky Civil Rights Act. Gene Parks was an 11-year employee of UPS, and on May 26, 2011, he learned that he would require surgery to repair a herniated disc in his neck. On his first day back to work, which was May 31, he told his supervisors that he needed time off, FMLA time, to get surgery. He talked to his first supervisor, a man named T.J. Loveless, at around 4 a.m. Then a couple hours later, between 7 and 8 a.m., he talked to the second supervisor, Jennifer Valdez, and he informed her at that time that he needed leave time for FMLA surgery. About two hours later, at 9.18 a.m., Valdez sent out an email recommending Mr. Parks' termination. The evidence also is that Mr. Loveless and Ms. Valdez conferred prior to the sending of that email. So here we have a situation where, on the same morning, within hours of the request for FMLA leave, Mr. Parks is terminated. Were the supervisors the ultimate decision-maker of the decision of termination? They could not ultimately make the decision, but what the evidence is, is they had to recommend the termination, then it had to be approved by HR. The ultimate decision-maker was the HR manager, Michelle Chavez? She approves the recommendation of the supervisor. No, she makes the decision, does she not? Yes, but she will not make the decision without that recommendation. Her decision, did she know of the request of your client for the most recent FMLA leave that he communicated to the supervisors? She did not. All right, isn't that significant? I don't believe it is, Your Honor, because if you look at the way the termination position operated here, the termination recommendation will not be made, or has to be made, by the supervisors. They were clearly aware of the FMLA request. Had they not given the input recommending the termination, Ms. Chavez would never have been involved. So the fact that they put it through this additional person and don't let her know what's going on, I don't think that really insulates the decision, because you have two supervisors who make the recommendation, both of whom are aware of the FMLA request. And I think that, in and of itself, is enough to taint the decision to allow a fact-finder to make a determination as to whether there's a causal connection or even whether there's pretext here. I mean, this is almost the same as if I walk up to you and say, I'd like FMLA leave. Fine, you're fired. I mean, it almost happens that quickly here. You have an intermediate step, though. You're saying the supervisors put it in motion. They put it in motion. She doesn't know about it to say that the company retaliated, I guess, when the decision-maker doesn't know about it. But the practical effect, Your Honor, is… No, the practical effect, but you have to prove motive, right? I have to prove motive, but if the recommendation is tainted, that taints the entire decision. I mean, if the person who's making a recommendation to terminate is doing so for improper purposes, the fact that they conceal their improper purposes from the person who's making the decision and just give them part of the story should not insulate that decision from review here. It at least creates a factual question that a jury should be allowed to determine here. And the facts are that your client had all kinds of disciplinary warnings and write-ups. I mean, I know you contest that they really don't have much substance to it, but, I mean, he's got a long history. Over his 11 years, he had a history of some disciplinary issues, certainly. Things that he's been put on final warnings and, I mean, he's got several final warnings, right? As do many of the employees they did not fire, Your Honor. He does have some final warnings, but the point is here also, when she wrote her email, Ms. Valdez says, I was aware of these problems before. You know, she says in her thing, I knew he was on a final warning is what she says in her email. And I became aware of the issue that's making me make this recommendation over a week ago. And now I'm making a recommendation for termination. So you can look at that in a couple of different ways. Certainly, you could look at it and say, oh, it's just the warnings, that's all it is. That's one inference that could be drawn from the evidence. But another inference that could be drawn from the evidence is she knew of the final warnings. She knew of the event giving rise to this alleged termination decision. She did not deem them worthy of firing him at the time. He tells them of FMLA leave, and now all of a sudden he needs to be fired. Those are inferences to be drawn from the evidence as well. That's why I'm saying this case needed to go to a jury. Because her email makes very clear, I knew he was on final warning. I knew about this event a week ago. But I didn't do anything to terminate him for that week. He tells me in the morning he needs FMLA leave. I confer with my co-supervisor here, and now we decide he needs to be terminated. I think that timing of that makes it very suspicious here. I think it's very similar to a case that was in front of this court, the Arban v. West Publishing, where the court said, well, where the timing is suspicious, where the person knew, in that case it said the person making the recommendation for termination knew of the alleged misconduct before the request for leave was made. I think the court could look at all those things and say, you know, this is a jury question. A jury has to decide here whether or not they were motivated by his request for FMLA leave or whether they were really motivated by poor performance. Because there is some disciplinary history, and I acknowledge that, Your Honor, but you also look at there's many other employees to whom we've cited in the record where they took a much more lenient approach. For example, with some employees, they would wait months before they'd write something. One employee, I think, had a disciplinary matter, and they didn't bother writing it up for eight or nine months. Mr. Parks, well, he has an incident, and all of a sudden now he has to be fired. The other people, they would lump tons of disciplinary problems or tons of performance problems into one warning and then string out the disciplinary. So they claim to have a progressive disciplinary process, but it's really actually extremely fluid, and it's applied in different manners. Weren't there occasions that your client had more than one error included in one write-up? A couple. There were a couple of that. But on these final ones, basically, it was one error, and boom, he was immediately put on discipline, put on warning, and terminated. And that's not the way they've done with the other people. The other people, they've kind of strung out the disciplinary process. They'll wait several months before they discipline him for something that happened months earlier and then combine them all into one warning. With Mr. Parks, it was like he would commit an offense, be immediately warned, commit an offense, be immediately warned. So there is some disparate treatment. So although there is a history of discipline, I acknowledge that. I think you have to look at it in the context here, and also you have to couple that with the timing of this incident here. Something she knew about a week ago. If it really merited discharge, why didn't she recommend the discharge a week earlier? Why did she wait until the morning he requested of him a lay leave to recommend the discharge? I thought her testimony was that as she was looking at it on that day, the 31st of May, that she realized at that point that he, for the first time, that he was on final warning. Well, I think her testimony, I would disagree with that. I believe her testimony was that she had been aware. And besides, she's the one who wrote the warnings. So for her to say, oh, I wrote all these warnings, but I didn't realize it, I think is a credibility question. And he had multiple violations on that very day, right? Well, she says that basically the final event they say that happened was he put away a container incorrectly, which she learned about that week, or a week earlier. That's what she has in her email. So, I mean, was Gene Parks a perfect employee? Of course not. Nobody is. But the point is that if you have to look at what happened here, here she is, I'm requesting leave, FMLA leave, at 7 a.m., and all of a sudden at 9, 18 a.m. I'm being fired. Now, what happened in between there is the real question. And basically, what we do know is that Ms. Valdez and Mr. Loveless conferred, and they jointly put this email together, according to their testimony. And that follows on the heels of the specific request. And we also know that Mr. Loveless was not a fan of FMLA leave, according to the evidence of record. He referred to it as a bunch of BS, basically. Said it's something employees do to just jip the system. And we had an affidavit from a Joseph Crisman who said that he made many comments negative to FMLA leave. So I think if you have a person who has a hostility to FMLA leave, you have a termination following within hours of the request for FMLA leave, the termination relates to something that was known a week earlier and did not merit discharge. And she writes in her email, It was brought to my attention late last week you put away a container incorrectly. I was about to complete a write-up. So in other words, she's saying, I knew about this last week. When I knew about it last week, I didn't view it as needing a discharge. The intervening event, though, is the request for FMLA leave. Now, you can... What does the rest of her email say? I'm sorry? What does the rest of her email say? However, since Jean was on a final written warning for performance, I'm going to recommend termination. But she already knew he was on a final written warning for performance. And that's my point is she knew he was on a final written warning for performance, that she knew about that, she knew about the event, and did not deem them worthy of discharge. He makes his FMLA request, and now all of a sudden he is needing to be discharged. I think they want to have you draw the inference, and it's one inference to be drawn that she just decided to do this, and it was purely performance-related. That is an inference from the evidence. But on summary judgment, of course, you're not supposed to be drawing the inferences other than drawing them in my favor. And I would submit that looking at this, a jury looking at this could say my inference is correct, that they weren't going to fire him despite his performance problems. He makes a request for FMLA leave, and now all of a sudden he is discharged. What is the most recent or the nearest statement by Mr. Loveless that is opposed to FMLA leave in the record relative to this discharge? What's the closest one? I don't know that dates were given in the record, Your Honor. I believe the record is obscure on that point. I think Mr. Chrisman did not give dates on that. He'd been discharged a few months before Mr. Parks, so it had to be at least a few months in reference. Was he discharged a few months or was he discharged over a year? I'd have to look at his affidavit to be positive, Your Honor. It might have been a year. I apologize if I misspoke on that. But it would have been a year or more ago, and Mr. Parks testified in his deposition that the statement about him making a bunch of BS and gypped the system, he did not give dates on that, so we don't know. But I think it's unrealistic to say that, well, even though those were made a little bit time ago, that somehow his attitude changed. There's no attitude. I mean, that would be like somebody who repeatedly says, I hate old people and then gets sued for age discrimination. Well, do you really believe the attitude's going to change? Well, he says, I hate FMLA in essence, and we know he said that, and is there any reason to believe that all of a sudden that does not influence the decision, especially when you look at the timing of this decision here? We also know that the plaintiff had multiple FMLA leaves granted to him and had never been terminated before this, right? I'm out of time. May I answer? Sure. Your Honor, he had had FMLA leaves, but there's a couple of distinctions. First off, on most of the prior leaves, neither Mr. Loveless nor Ms. Valdez was his supervisor. Secondly, they were never anything that would require him to be out for an extended period of time. He took a couple of intermittent leaves. Third, he testified that on those intermittent leaves, he never took as much time as he was allowed by his doctor, even because he did not want to take that much time off work. This is the first time that he'd ever requested leave for himself where he would be off for an extended period of time. So I do believe it's different in type, and especially the fact that there's different supervisors involved. Did you preserve some time for rebuttal? Three minutes, Your Honor. You'll have it. Thank you. Good morning. Good morning, Your Honor. May it please the Court. My name is Gene Droder on behalf of Appalee UPS Supply Chain Solutions. This Court should affirm summary judgment because what we have here is an employee who was on a final warning with a long history of performance issues and commits two more terminable offenses and then seeks to avoid being terminated for those just because the employee requested a leave of absence. He cannot prove that his termination was a pretext for violating the FMLA because the honest belief rule applies here. The honest belief rule says that if an employer makes a reasonably informed decision, then you cannot prove that the decision had no basis in fact for the purpose of proving pretext. And all the discipline for Mr. Parks was based on the reports and information in UPS's systems and his disciplinary history. And Judge Strange, I believe, asked for specifics about the email, what the email actually said. It is not true that the email said she knew about it a week ago or that she knew about the final warnings. What she said was, I found out about this late last week, and her testimony was it was from an audit on Friday. And then there was a second error on the morning that he was actually terminated. So there were two errors. She didn't know about him for over a week as Mr. Blankenship represented. It was late last week. So what we have here is we're on the Friday before Memorial Day. He commits this error. They learn about it through an audit later that day. Monday is a holiday, so nobody's there. The very next work day is Tuesday. So the first opportunity that she has, Jen Valdez has, to communicate with HR about it and to talk to Mr. Parks about it is the day that they terminate him. So it's not like they waited and kind of pounced on it after he requested leave. But there's nothing in the record that indicates when he said to her, I need some leave, she said, I'm sorry, you're on termination status for employment errors. Well, part of the issue, Your Honor, to answer that question is there's a dispute, and I mean that's part of the reason why the district court initially denied ceremony judgment. There's a dispute about whether he actually requested FMLA leave that morning. Actually, according to the testimony, he had been talking about FMLA leave for surgery for years, going back to 2009 or even further. So the way that there isn't any testimony to that effect, Your Honor, as you framed it. As you phrased the question. There isn't a testimony to that effect that she said, I'm sorry, you're on termination status. The conversation was when they came to the meeting, you're being terminated. According to Mr. Parks, all he remembers from that meeting was that T.J. Loveless, his supervisor, said this final error was a tipping point, and because you've done some other things, we're going to have to let you go. All that Mr. Parks remembers from Mr. Valdez was that she said about COBRA. He didn't remember anything else. It doesn't mean she didn't say you were terminating you for these errors. All that he could remember was that was what the COBRA writes. I guess the question is we're on summary judgment. Correct. If there's a dispute of material fact, then it's for the trier of fact to determine that, correct? There's a dispute of fact about whether he actually requested leave that morning. I don't believe there is a dispute of fact as to what was said in that meeting because we know the reason for the termination. It's documented in the email, and to Judge Griffin's question, the decision was made by Michelle Chavez. She was the decision maker. The reason she said, and she's got an undisputed affidavit. She was not deposed. She was not cross-examined. She said, I made the decision based upon that email and the history. So that's the reason he was terminated. We know that, and we know that there's an honest belief that he made these mistakes because that's what the computer errors show from the computer systems. So there's no dispute about why he was terminated. The dispute is that there was a leave request. With respect to the termination and what was communicated to him, there's no dispute because he just said, all I remember is this. That doesn't mean these communications didn't happen. He just says, all I can remember is this is what she said. But he also said in that meeting, I don't care if you fire me, just let me have my neck surgery. So he didn't even dispute at that time that he committed these errors. These have been sort of arguments that have come out later. Mr. Blankenship talked about comparators. Now, there are no actual comparators that were treated more favorably than Mr. Parks was. He cannot point to a single employee whose disciplinary history is similar in all respects but was treated more favorably. The one person he relies most upon is Ms. Brenda Kinman, who, like Mr. Parks, was actually terminated after she committed an additional performance infraction when she was on a final warning for performance. Now, Mr. Parks tries to argue that, well, she had multiple opportunities for final warnings. Well, so did Mr. Parks. Mr. Parks was on two final warnings. He had a final warning for conduct and behavior and a final warning for performance. And so that is what we're dealing with. When you have different types of conduct, it's treated differently. And so he was not given less favorable treatment. He was treated the same. And actually, if you count up all their discipline in total, regardless of the type of behavior it's going about, they both had seven infractions on their record at the time they were terminated. You have the argument about Kathy Harms as a comparator who had a whole series of mistakes that were consolidated on a single disciplinary action. I believe, Your Honor, that's a misrepresentation of the record from Mr. Blankenship. What actually happened, she did have 17 total errors. But there were, and I don't know how it was breaking down, but it was in two different instances. And it resulted in two different disciplines. It's not like she was disciplined at one time for these 17 different errors. There was actually two different warnings, one verbal and one written, for two different sets of errors that were committed at or around the same time. His complaint was that there were a series of errors and that instead for Mr. Parks they were a singular error resulting in a singular disciplinary action. How does the record respond to that? Your Honor, I think, Judge, you actually did point to that fact in your questioning of Mr. Blankenship, that there were actually instances where Mr. Parks' errors were lumped together too. So, for example, his second written performance warning, he committed four status 10 errors. He wasn't given four different disciplines. He committed four errors and was given one piece of discipline. That was on January 12, 2011. His third warning, six errors, one discipline. His final warning, eight errors. And on that one, there was an audit of 97 cases. And the 12 boxes that were attributable to Mr. Parks, of his, he had the only ones that were put in incorrectly. Eight errors, one piece of discipline. So your position is that where they are, errors discovered together, it was the practice to put them on one? Yeah, at or around the same time. So it might have been, part of the reason is we don't know when some of these were discovered. We know when they happened because the computer system shows, okay, for example, Gene Parks was handling this box on January 2, and then it might have been discovered two or three days later from a report or an audit. But you know when it occurred because the computer shows when he was handling the box. So when you go to, you know, they do an audit, for example, and they see, okay, on Monday and Tuesday, he committed six errors. So that's one piece of discipline. So when they were discovered at or around the same time, that's when the discipline occurred. And the same thing happened with Gene Parks. He actually, even going back to 2010, May 28, 2010, he had two different types of conduct that were being disciplined and combined into one warning. He was being counseled for productivity and for quality, and he was given one written warning. So the point is, Your Honor, he was not treated differently. He was treated like other employees were. I think the other concerning thing for me is the statements of Mr. Loveless. Can you address that, please? I sure can. Your Honor, the biggest reason why these statements do not indicate any evidence of retaliation is the timing. They're considered stray remarks according to the case law. I mean, we have numerous cases that are cited in our brief that if you have an alleged biased comment that occurs over a year prior to the actual termination decision, then it doesn't taint the termination decision because it's a stray remark. Does the record reflect that all of the comments at issue were over a year old? It does, Your Honor, and you do have to piece some of the things together. For example, Mr. Parks says that these comments that were allegedly made about another person taking ethmoly leaf by Mr. Loveless, they occurred when they were in the old building. That was his testimony. He couldn't put a date on it, but he said when they were at the, quote, old building. Well, that was before 2010 because by 2010 they were in the new building, so we know the date at that point. It was before 2010. The other ones, the only comment that was directed to Mr. Parks by Mr. Loveless was basically that he thought when Mr. Parks was taking leaf for his wife that he frowned upon it. According to Mr. Parks' testimony, Mr. Loveless just shook his head and said, like, I don't believe it or something along those lines. And when was that? That was when Mr. Parks was taking ethmoly leaf for his wife's condition. He took ethmoly leaf for his wife's condition between 2004 and 2007, so that comment had to have been no later than 2007. The last comment is about an individual by the name of Joe Chrisman, and Mr. Blankenship said that we couldn't really tell the date. The dates were obscure. Well, we know Mr. Chrisman was fired in January of 2009 for failing a drug test after an accident. So again, the comment about Mr. Chrisman had to have been well over a year and a half, almost two years, more than two years actually, before the actual termination decision. So these comments, alleged comments from Mr. Loveless, are not evidence of discrimination, and it's also not evidence of discrimination when you consider it in light of the other evidence. For example, Ms. Chavez is the one who made the termination decision. There's been no allegation that she ever had any bias towards ethmoly leaf. Jen Valdez is the one who drafted the email. Mr. Parks admitted that he had no reason to believe Ms. Valdez would ever discriminate against him or retaliate against him on the basis of ethmoly leaf. Also, when you consider it in light of the fact that Mr. Parks had taken ethmoly leaf since 2003, I mean, why all of a sudden would he be discriminated against or retaliated against for ethmoly leaf if he's been taking ethmoly for so long? He actually did request surgery and did take ethmoly leaf for surgery long before. Back in 2003, he took off six to eight weeks for shoulder surgery, and his disciplinary problems preexisted that. He's got a disciplinary record. Even outside of the ones that resulted in his termination, there's at least 15 things that he's been disciplined for going back to 2002. So the discipline, the performance issues occurred before the ethmoly leaf. He's been on ethmoly leaf in various capacities, including in 2009 and 2010 when Mr. Loveless was supervising him and when Ms. Valdez was supervising him. So he actually had intermittent leave in 2010 and 2011. So to assume that all of a sudden the supervisors are going to take action against him because he allegedly requests surgery is not supported by the record. I mean, that's an inference that shouldn't be drawn, but it's certainly not an inference that can be drawn based on the comments that were occurring several years before he was actually terminated. One thing that is, I think, an unclear legal point from the brief from Mr. Blankenship, but I want to make sure it's clear here before the court. So when you take all this other alleged evidence of pretext, it falls away. The comparators were treated the same or they're not properly considered comparators. These comments go away because they're stray remarks. They're not in any way tied to the decision, and they're stale. Because they're so old. So all that Mr. Parks is left with is this timing. And timing alone cannot prove pretext. That is very clear case law from this court. In the Seeger case, this court plainly stated, unlike its role in establishing the prima facie case, the law in this circuit is clear that temporal proximity alone cannot be the sole basis for finding pretext. And so that is what Mr. Parks is left with. When all the rest of this falls away, it's the timing between when the alleged request for surgery happened and his termination. And even that timing is less suspicious when you consider it in light of all the facts. The history of FMLA leave. The fact that he's got a long documented history of performance issues. The fact that Jen Valdez, he had no basis to say Jen Valdez, whatever, discriminated or retaliated against him on the basis of FMLA leave. So for that reason, summary judgment with respect to the FMLA retaliation should be affirmed. And for similar reasons, summary judgment on the FMLA interference claim and the failure to accommodate the disability claim should also be affirmed. The FMLA interference claim should be analyzed in the same way that we analyze the retaliation claim. And I think that's clear from the Donald case from this court. Where you've got somebody, an employee who was terminated for reasons unrelated to their leave of absence, then you analyze the interference claim in the same way you do as a termination retaliation claim. And because Mr. Parks cannot prove pretext, he also cannot prove that there was an FMLA interference. And then for the same reasons, the accommodation claim should fail. So here the accommodation that he requested is I just want my surgery, and so can you just delay this termination, or don't terminate me so I can have my surgery, is actually what he requested in that meeting. Well, number one, that's not even a reasonable accommodation. Number two, he's not entitled to the leave because there's a legitimate termination. So if he's going to request leave several weeks later, but he's got a legitimate termination, then he's not entitled to that leave. It wouldn't be a reasonable accommodation. And this court, the Sixth Circuit, has not really directly addressed this question of whether an employee's conduct predating an accommodation request can be forgiven in order to accommodate an employee's disability. But other circuit courts have and have said forgiving somebody's misconduct is not a proper accommodation. But what this court did say in Whitfield, and I see my time is up. Can I finish that point and conclude? Thank you, Your Honor. What this court did say in the Whitfield v. Tennancy case is that an employer is not required to ignore performance errors that are committed by an employee who requests an accommodation. So that is fairly close to the situation we have here. So for those reasons and those stated in our brief, Your Honors, I request that summary judgment be affirmed for UPS Supply Chain Solutions. Any other questions? Judge Scratch, Judge Steele. Thank you. Mr. Bleikmanschek, I've got three minutes rebuttal. Thank you, Your Honor. First, I want to address this surgery in 2003. Neither Ms. Valdez nor Mr. Loveless was the supervisor at the time, so I don't think it's particularly pertinent. But going back to what he said here, there is very clearly a disputed material fact about whether Mr. Parks requested FMLA leave on the morning. In fact, Ms. Valdez herself creates a fact because in her testimony, she says, I can't remember if there was a conversation, yet she signed an affidavit that said there was no conversation. So she's giving inconsistent testimony right there. So I think that creates a fact. For purposes of this motion, we would have to assume that there was a request. I would agree. There's a disputed fact. We construe the fact in the light most favorable to the non-moving party. So I think that's a given. Okay, I agree. I agree with that point. But I also think Ms. Valdez and Mr. Loveless have given inconsistent reasons for what motivated the discharge. In the email, she talks about him putting a container away incorrectly. In her testimony, she said he didn't put it away incorrectly. He failed to scan it correctly. Different things. During the termination meeting, they said that, and this is Mr. Parks' testimony, he said that they told him they'd been looking for a specific box for 20 to 30 days, and they just found it on May 31, which is inconsistent with the email. And then at one point they said, you know, so you got one testimony where they're saying they're looking for a specific box for 20 to 30 days, but then they say, well, we found it during a random audit. Well, are they looking for a specific box, or is it a random audit? There's inconsistencies in the explanation, which I think again creates some credibility questions or problems for UPS, and that makes us go to a summary judgment inappropriate here because the jury has to decide that issue. Now, this temporal proximity issue, I would submit, it's not the only thing I offered, but that is enough in this case because what this court has held in DiCarlo v. Potter and several other cases is where the request for the protected activity happens and the adverse action happens shortly thereafter. I think the phrase used in DiCarlo is where it's acutely near in time. The court can say that's enough in and of itself to create a jury question, and it has to be decided by the jury. And also... Temporal proximity alone can create a jury? I thought you needed that plus something. Well, actually, if you look at Mickey v. Zeidler, I think they're saying that in some instances where the adverse action, excuse me, where it immediately follows on the heels of the protected activity, that can be enough because what Mickey says is in that instance it's pretty much impossible to come up with some other reason, some other pretext evidence. So the court's going to say that can be enough. And in Mickey, I would also point out... I don't have any case where I've said that. I don't believe I do. But I will also point out that in Mickey also, I cited a case from the Tenth Circuit, O'Neill v. Ferguson Construction, and they cited that with approval in Mickey v. Zeidler. O'Neill specifically held that where it's that close in time, a jury question is created on not only the issue of causal connection of the prima facie case, but is created on the issue of pretext. And the Mickey case cited that O'Neill case with approval. So I think there's some indication in Mickey that it could be enough. And also in DiCarlo and Abbott v. Crown Motor and Ford v. General Motor Company, the court has said where it's very close in time, that is indirect evidence of retaliation as well. You're out of time. Oh, I apologize. Any further questions? Judge Scratch? Nope. All right, thank you very much, counsel. The case will be submitted. And with that, you may adjourn the court.